**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**


**ELIZABETH SRITE**                                                 **PLAINTIFF**


**v.**                          **NO. 4:20-cv-00741 PSH**


**ANDREW SAUL, Commissioner of**                        **DEFENDANT**
**the Social Security Administration**


## MEMORANDUM OPINION AND ORDER


In this case, plaintiff Elizabeth Srite ("Srite") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Srite so maintains for one reason. It is Srite's contention that her residual functional capacity was erroneously assessed because the ALJ failed to properly weigh the medical opinions of Dr. Billy McBay, M.D., ("McBay"), Srite's treating physician.

---

[1]    The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) [quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)].

Srite was born on August 14, 1965, and was fifty-two years old on October 19, 2017, the date she allegedly became disabled. In her application for disability insurance benefits, she alleged that she is disabled as a result of a back injury.

Srite ably summarized the evidence in the record. The Court will not reproduce the summary, except to note the evidence germane to the lone issue in this case.

On February 13, 2017, Srite presented to a hospital emergency room complaining of low back pain brought about by a workplace accident. See Transcript at 319-324. A physical examination revealed that she had a full range of motion, although she had mild tenderness with palpation in her lumbar spine. Imaging of her lumbar spine revealed "degenerative disc space narrowing at L3-L4, L4-L5, and L5-S1," the "most pronounced at L3-L4." See Transcript at 323. A lumbar strain was diagnosed, and she was prescribed Flexeril for her pain.

Srite returned to the hospital emergency room on February 19, 2017, for what was later determined to be a two millimeter ureter stone. See Transcript at 309-314. A physical examination revealed that her muscle strength was "5/5 grossly," her extremities were non-tender, and she had a full range of motion. See Transcript at 310.

On April 13, 2017, Srite saw Dr. Bill Lawrence, M.D., ("Lawrence") for complaints that included low back pain. See Transcript at 340-342. Srite rated the intensity of her back pain as six on a ten-point pain scale. She represented that her pain was made worse with activity but improved with rest. Lawrence's assessment included low back pain and lumbar disc herniation without cord compression. He prescribed Norco for her pain.[2]

On August 29, 2017, Srite saw Dr. William Ackerman, M.D., ("Ackerman") for a pain medicine consultation. See Transcript at 729-733. Srite reported that she began experiencing pain in her lumbar spine approximately six years earlier and had recently experienced a sudden onset of pain following a workplace accident. Her pain intensity score fluctuated between three and ten, and she characterized her pain on that day as seven. She was taking medications that included hydrocodone and Naproxen. A physical examination revealed, in part, the following:

> [Srite] has pain in the low spine with pain in the distal 1/3 of the lumbosacral spine between L4/5 made worse with flexion. Palpation between the spinous processes at L4/5 cause[d] her to have pain as well as radiation of pain into the left lower extremity. ...

---

[2]     Srite saw Lawrence again on August 10, 2017. See Transcript at 337-339. Srite's symptoms and severity of pain at that presentation largely mirrored her symptoms and severity of pain from the April 13, 2017, presentation.

See Transcript at 732. A straight leg raise test was positive at forty degrees "with an L2/3 radicular pattern." See Transcript at 733. Ackerman assessed a lumbar spine sprain/strain and lumbar spine radiculitis. He prescribed Percocet, ordered a lumbar MRI, and recommended a back brace.

Srite thereafter saw Ackerman on multiple occasions for pain management.[3] The progress notes from the presentations are substantially similar in that Srite continued to complain of pain in her back and lower extremities. She reported that the pain was exacerbated with movement, standing, and sitting but ameliorated with medication and rest. Her pain intensity score fluctuated between six and seven. She had a decreased range of motion in her back and pain with flexion at several points in her back. She also had a somewhat antalgic gait. Ackerman's diagnoses included degenerative disc disease at T5/6 and L5/S1.[4] He continued to prescribe medication that included Percocet, administered steroid injections, and recommended a sitting/standing desk at work.

---

[3]    See Transcript at 726-728 (09/25/2017), 724-725 (11/01/2017), 721-723 (11/21/2017), 718-720 (12/19/2017), 715-717 (01/22/2018), 712-714 (02/19/2018), 670-672 (03/05/2018), 708-710 (03/19/2018), 705-707 (04/17/2018), 702-704 (05/21/2018), 699-701 (06/19/2018), 695-697 (07/17/2018), 692-694 (08/13/2018), 689-691 (09/10/2018), 686-688 (10/08/2018), 683-685 (11/05/2018), 680-682 (12/03/2018), 677-679 (01/07/2019), 673-675 (02/05/2019), 752-754 (03/26/2019).

[4]    The progress notes reflect that Ackerman also diagnosed bilateral carpal tunnel syndrome as a result of Srite's complaint of pain in both wrists.

On September 5, 2017, Srite underwent MRI testing of her lumbar spine. <u>See</u> Transcript at 347-348. The testing revealed the following:

> Moderate to severe rotational levoscoliosis is noted. Asymmetric disc osteophytes, endplate changes and facet degeneration are seen, most prominent at the L3/L4 and to some extent the L4/L5 levels. At the L4/L5 level the disc osteophyte abuts the exiting left L4 nerve root. However, there is no acute disc protrusion or extrusion. Variable foraminal and lateral recess encroachment is present.

<u>See</u> Transcript at 347.

On September 7, 2017, Srite saw McBay for complaints that included back and extremity pain. <u>See</u> Transcript at 407-409. Srite rated the intensity of her pain as four and reported that it was made worse with activity. A physical examination was unremarkable.

Srite thereafter saw McBay for continued complaints of back and extremity pain.[5] The progress notes from the presentations are unremarkable. Srite's gait was typically normal, and her extremities showed no signs of clubbing, cyanosis, or edema. McBay routinely diagnosed a backache and referred her for pain management and "possible surgical needs." <u>See</u> Transcript at 627.

---

[5]     <u>See</u> Transcript at 410-412 (10/25/2017), 413-417 (11/21/2017), 427-429 (02/26/2018), 614-617 (05/15/2018), 622 (07/12/2018), 625-627 (10/04/2018), 628 (10/09/2018).

During the course of treating Srite, McBay completed a physical assessment and authored a "To Whom It May Concern" letter on behalf of Srite. See Transcript at 456-458. McBay opined in the assessment that during the typical eight-hour workday, Srite could not stand or walk for any length of time, could only sit for a total of one hour, would need to recline or lie down in excess of the typical work breaks afforded employees, and would require unscheduled breaks of approximately sixty minutes in length. Srite could occasionally lift and carry less than ten pounds. Although she would have limitations in doing repetitive reaching, handling, and fingering, she could use her arms, hands, and fingers for activities one hundred percent of the time. McBay opined that Srite's impairments and treatment would likely cause her to be absent from work more than four times a month.

In the "To Whom It May Concern" letter, McBay offered additional details about Srite's medical condition. He represented that an MRI of her back shows "severe levoscoliosis, osteophytes, endplate changes, and facet degeneration, most prominent at L3-L5," and "[a]n osteophyte abuts the existing left L4 nerve root." See Transcript at 456. He represented that surgical intervention is necessary and opined that she needs to avoid activities, including work, that exacerbate her pain.

On September 20, 2017, Srite was seen by Trent Tappan, P.A., ("Tappan") at Arkansas Specialty Orthopaedics. <u>See</u> Transcript at 377, 489-490. Srite reported that most of her pain was in her low back, although she had "intermittent pain that radiate[d] down the back of her left leg." <u>See</u> Transcript at 489. A physical examination revealed the following:

> Gait and station are normal. Neck normal inspection with no areas of tenderness[;] normal ROM stability and strength. Low back has normal inspection and mild tenderness to palpation[;] slight decreased ROM with good stability and strength. Right lower extremity has normal inspection and no specific areas of tenderness with good ROM, good stability and strength. Left lower extremity has normal inspection with no marked areas of tenderness, good ROM, good stability and strength. Sensation is grossly intact with no specific dermatomal deficit[;] reflexes are symmetric and stable with no pathologic reflexes];] Clonus negative. Babinski negative. Coordination and balance are normal.

<u>See</u> Transcript at 489. Tappan reviewed Srite's testing and observed multi-level degenerative changes, the most significant being at L3-4 and L4-5; a "vacuum disc phenomenon at L3/L4;" and "foraminal stenosis most severe on the left at L4-5." <u>See</u> Transcript at 377. Tappan diagnosed lumbar degenerative disc disease at L3-4 and L4-5 and spinal stenosis at L4-5. He did not recommend surgical treatment at that time but thought a fusion at L4-5 might be beneficial. He also recommended a steroid injection.

Srite saw Tappan again two months later. See Transcript at 380, 384-387, 493-494. Srite reported that she did not obtain much relief from an earlier steroid injection and continued to experience constant, sharp, severe pain in her lower back and left leg. Tappan reviewed Srite's testing and made findings similar to those he had previously made.

On May 2, 2018, Srite saw Dr. Michael Cassett, M.D., ("Cassett") for an evaluation. See Transcript at 563-575. A physical examination revealed the following:

> The lumbar spine is normal in appearance, as well as the overlying skin. There is diffuse mild bony point tenderness. There is diffuse mild tenderness over the SI joints. Range of motion is limited in flexion and extension with reproduction of pain. Seated SLR is normal. DTRs are 2+ at both patellas and achilles. There is no clonus. Strength is normal at bilateral hip flexors, quads, tibialis anterior, gastroc, EHL. Sensation is intact in both lower extremities in all dermatomes. There is no pretibial edema.

See Transcript at 566. Cassett reviewed Srite's testing and found degenerative changes in her lumbar spine. He opined that her radicular leg pain could be explained by chronic disc changes at L3/4 and L4/5, although he could not confirm that fact. He diagnosed chronic bilateral low back pain with left-sided sciatica and recommended pain management that included medial branch blocks and additional testing.

On May 29, 2018, Kaitlin Bloomfield ("Bloomfield"), a physical therapist, completed a functional capacity evaluation on behalf of Srite. See Transcript at 514-528. Bloomfield opined that Srite was capable of only sedentary work, although Bloomfield noted that the results of the evaluation could not be considered an accurate representation of Srite's functional abilities as she might retain greater abilities.

On July 9, Srite saw Dr. Regan Gallaher, M.D., ("Gallaher") for an evaluation. See Transcript at 503-505. Srite reported that physical therapy and steroid injections had been ineffective in relieving her pain. A physical examination revealed that she had a "deliberate to careful gait and a slight stooped posture," see Transcript at 504, but normal lower extremity motor function. Gallaher reviewed Srite's testing and found a "moderate case of degenerative rotatory scoliosis with severe loss of disc space height and endplate sclerosis at L3-4, L4-5, and L5-S1." See Transcript at 504. She also had "an early kyphotic deformity of her lower thoracic spine" and a "far lateral disc herniation on the left side at L4-5 and on the right side at L3-4." See Transcript at 504. He diagnosed spondylosis with radiculopathy in her lumbar region. He recommend she consider a reconstructive spine operation but only if she had "thoroughly exhausted all aggressive conservation management issues." See Transcript at 504.

On October 17, 2018, Srite underwent MRI testing of her lumbar spine. See Transcript at 584-585. The testing revealed, in part, disc space narrowing and a bulging disc at points along the lumbar and thoracic portions of her spine. The impressions of the interpreting physician were multi-level degenerative findings and scoliosis, but there was no evidence of nerve root impingement or an acute lumbar spine injury.

On November 27, 2018, Srite saw Dr. James R. Adametz, M.D., ("Adametz") for an evaluation. See Transcript at 510-511. Srite's chief complaints were back and left leg pain. Adametz observed that Srite walked stooped over. Srite was taking oxycodone at the time and had previously taken naproxen with little benefit. Adametz reviewed Srite's testing and found degenerative disc disease at L3-4, L4-5, and L5-S1. Srite had a "little bit of stenosis and at least a bulging disc at L3-4 and L4-5, which was worse on the left." See Transcript at 510. She also had some narrowing of the thecal sac and foramen, but the narrowing was not severe. The L5 appeared to be "somewhat malformed" and was "a little different than your usual scoliosis that is just degenerative disc disease." See Transcript at 511. Srite and Adametz discussed treatment options, including the possibility of a spinal cord stimulator, but no formal treatment plan was agreed to at that time.

Srite saw Adametz again on December 18, 2018. See Transcript at

508. During the presentation, Adametz noted the following:

> ... The only thing I really see is I think on the left side at L3-4
> and L4-5 there is a combination of facet hypertrophy and
> bulging disc that might really be causing enough nerve root
> compression that we could at least make some stuff better if
> we decompress those two levels and then looked at the disc.
> The radiologist kind of read it as almost worse at the other side,
> but I disagree. At L5-S1, there is a little bulge of the disc, but I
> don't see any nerve root compression. There is sort of a
> degenerative disc at almost every level. The worse levels are
> L3-4 and L4-5.

See Transcript at 508. Adametz observed that "some doctors might

recommend fusing multiple levels," but he thought the "odds of that really

getting her good long-term relief is not good." See Transcript at 508. He

instead recommended continued pain management, "some kind of

decompressive procedure," a discectomy, and a spinal cord stimulator. See

Transcript at 508.

On January 9, 2019, Srite underwent a left L3-L4 hemilaminotomy

and discectomy and left L4-L5 hemilaminotomy and discectomy with

microscopic dissection. See Transcript at 666-667. Adametz's post-

operative note appears to reflect that he believed the procedure to have

been a success.

Srite completed a series of documents in connection with her application. <u>See</u> Transcript at 240-249. In the documents, she represented that she has difficulty attending to her personal care but can prepare simple meals and perform light housework. She is able to shop for groceries, keep her medical appointments, and occasionally attend church. She is able to drive an automobile, although her medication impairs her ability to do so. She can only walk for about fifteen minutes before she must rest for ten to fifteen minutes and cannot sit for any length of time.

Srite testified during the administrative hearing. <u>See</u> Transcript at 43-58. She is unable to work because of her back pain, which prevents her from standing or sitting for very long. Her current medication includes oxycodone. She does not require an assistive device to walk. The surgery performed by Adametz was of some benefit in reducing the numbness in Srite's left leg. The only restriction he placed on her was to "not lift anything—I guess he probably said nothing heavier than maybe like a sack of groceries," <u>see</u> Transcript at 49, and to limit her bending. Srite requires help attending to her personal care, preparing meals, and performing household chores. A typical day consists of walking outside for ten to fifteen minutes to get "some kind of little bit of exercise," <u>see</u> Transcript at 52, then watching television.

The ALJ found at step two of the sequential evaluation process that Srite's severe impairments include lumbar spine degenerative disc disease (status-post discectomy). The ALJ assessed Srite's residual functional capacity and found that Srite is capable of performing light work with additional physical and mental limitations. As a part of so finding, the ALJ deemed unpersuasive the medical opinions expressed by McBay in his physical assessment. The ALJ gave the following reasons for doing so:

> ... McBay did not provide any objective support for [his] extreme assessments, including his finding that [Srite] would miss work more than four times per month and would need to recline/lie down throughout a workday. His opinions are not supported by unremarkable findings in his own treatment notes, including [her] normal gait and posture and normal motor function. ... The extreme opinions are also inconsistent with records from other providers, which similarly reveal a normal range of motion in the joints, full strength, and intact gait. ... The opinions are also inconsistent with [Srite's] self-reported daily activities, including shopping, driving a car, preparing meals, and completing light chores. ... [Her] own orthopedic surgeon failed to impose any such extreme limitations on [Srite].

See Transcript at 26. The ALJ found at step four that Srite is unable to perform her past work. At step five, the ALJ found that there is work available for a hypothetical individual of Srite's age, education, work experience, and residual functional capacity.

Srite maintains that her residual functional capacity was erroneously assessed because the ALJ failed to properly weigh McBay's medical opinions. Specifically, Srite maintains that the ALJ erred in evaluating the supportability and consistency of McBay's opinions. Srite maintains that contrary to the ALJ's findings, McBay's opinions are supported by his own treatment notes and, because McBay was copied with Ackerman and Tappan's notes, the notes of Tappan and Ackerman. Srite additionally maintains that McBay's opinions are consistent with the results of testing and the record as a whole. Srite notes that the record contains frequent mention of her reduced range of motion and abnormal gait, but the ALJ ignored those observations. Srite also notes that too much emphasis was placed on her activities of daily living. Srite notes that the ALJ's error was particularly harmful because "[Srite] would be deemed disabled if limited to sedentary work per the Medical-Vocational Guidelines." See Docket Entry 12 at CM/ECF 25.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). As a part of making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007).

The regulations governing the consideration of the medical opinions were revised for claims filed on or after March 27, 2017.[6] The new regulations eliminated the "long-standing 'treating physician' rule." <u>See Fatuma A. v. Saul</u>, 2021 WL 616522, 5 (D.Minn. 2021), report and recommendation adopted, 2021 WL 615414 (D.Minn. 2021).[7] The regulations now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

---

[6]     Srite's application for disability insurance benefits was filed in November of 2017 and is therefore governed by the new regulations.


[7]     The "treating physician" rule provided that the opinions of a treating physician were accorded special deference and were normally entitled to great weight. <u>See Despain v. Berryhill</u>, 9265 F.3d 1024 (8th Cir. 2019). The opinions were given controlling weight if they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. <u>See</u> <u>Id</u>.

> The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." ...

See Phillips v. Saul, 2020 WL 3451519, 2 (E.D.Ark. 2020) (Deere, MJ).[8]

Having reviewed the record in this case, the Court finds that the ALJ did not err in evaluating McBay's medical opinions. The ALJ adequately considered the supportability and consistency of McBay's opinions, and the ALJ's consideration of the factors is supported by substantial evidence on the record as a whole. The Court so finds for the following reasons.

The ALJ could and did find that McBay's medical opinions are not supported by McBay's own treatment notes. McBay's note from September of 2017 reflects that Srite had a normal gait and posture, and musculoskeletal and neurological examination results were normal. See Transcript at 409. He made identical findings when he saw her in October of 2017, November of 2017, February of 2018, May of 2018, and October of 2018. See Transcript at 412, 415, 429, 616, 627. He offered his opinions in

---

[8]     In Morton v. Saul, 2021 WL 307552, 7 (E.D.Mo. 2021), the district court noted that with respect to the supportability factor, "an opinion is more persuasive if it presents more relevant objective medical evidence and explanatory rationale in support of the opinion." With respect to the consistency factor, the court observed that "[s]tated more simply, an opinion is more persuasive if it is more consistent with the overall evidence as whole." See Id.

documents he completed in March of 2018. In the documents, he opined, in part, that Srite could not stand or walk for any length of time, would need to recline or lie down in excess of the typical work breaks afforded employees, and would likely miss work more than four times a month. It is quite a challenge to reconcile the unremarkable findings McBay made in his treatment notes with the extreme work-related limitations of Srite identified by McBay in his opinions.

Srite apparently recognizes the challenge posed by reconciling the unremarkable findings McBay made in his treatment notes with the extreme work-related limitations of Srite identified by McBay in his medical opinions. Srite attempts to overcome the challenge by noting that McBay's opinions are additionally supported by Tappan and Ackerman's treatment notes, which were sent to McBay.

Although Srite's assertion likely goes more to the "consistency" of McBay's medical opinions than to the "supportability" of the opinions, the Court assumes that McBay relied upon Tappan and Ackerman's treatment notes in formulating the medical opinions. The notes are capable of more than one acceptable interpretation, though, and can be interpreted as the ALJ did, _i.e._, the notes do not support the extreme work-related limitations of Srite identified by McBay in his opinions.

For instance, Srite saw Tappan in September of 2017, or approximately six months before McBay offered his medical opinions. Although Srite was experiencing severe pain, a physical examination revealed, in part, that she had a normal gait and station, only mild tenderness to palpation in her lower back, and only a slightly decreased range of motion with good stability and strength. Inspections of her lower extremities were unremarkable as she showed a good range of motion, stability, and strength. Her coordination and balance were normal.

Srite saw Ackerman in April of 2018, or approximately one month after McBay offered his medical opinions. Although Srite continued to experience severe pain, Ackerman observed that Srite's gait and balance revealed only a "slight antalgic gait." See Transcript at 706. Straight leg raise testing was negative bilaterally. A musculoskeletal examination produced inconsistent results. Although she had a decreased range of motion in her lumbar spine and experienced pain with flexion in the distal 1/3 of her lumbosacral spine, no muscle spasms were noted "to palpation of the deep musculature of the cervical, thoracic or lumbar spine." See Transcript at  706. Extension of her lumbar spine did not cause pain about the facet joints, lateral flexion did not worsen the pain about the facet joints, and sacroiliac joint pain was not present.

The ALJ also adequately considered the consistency of McBay's medical opinions, and the ALJ could and did find that they are not consistent with the overall evidence as a whole. First, the ALJ could and did find that McBay's opinions are inconsistent with the "records from other providers." See Transcript at 26. As the Court has noted, the ALJ could find as he did with respect to Tappan and Ackerman's examination findings, i.e., the findings are largely unremarkable. The findings, much like those made by Cassett, Gallaher, Adametz, and confirmed by the medical testing, reflect that Srite suffers from degenerative disc disease, some stenosis, and a bulging disc. The findings, though, are inconsistent with the extreme work-related limitations of Srite identified by McBay in his opinions. Although Bloomfield opined that Srite was capable of only sedentary work, Bloomfield noted that the results of her evaluation could not be considered an accurate representation of Srite's functional abilities.

Second, the ALJ could and did find that McBay's medical opinions are inconsistent with Srite's self-reported daily activities, including her ability to shop, drive an automobile, prepare meals, and complete light chores. The record reflects that Srite can perform those activities, although she may not perform them all the time. The Court is not persuaded that too much emphasis was placed on her ability to perform the activities.

Third, the ALJ found that "[Srite's] own orthopedic surgeon failed to impose any such extreme limitations on [Srite]." See Transcript at 26. Although a physician's failure to identify a claimant's work-related limitations should not be accorded too much emphasis, the record supports the ALJ's finding. Adametz did not impose any meaningful work-related limitations on Srite and certainly not to the extent McBay did in his medical opinions. At most, Adametz instructed Srite to not lift anything heavier than a sack of groceries and limit her bending.

The question at bar is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, "[a] reviewing court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision." See Id. [internal quotations and citations omitted]. In this case, the evidence is capable of more than one acceptable characterization, and the ALJ could find as he did with respect to Srite's residual functional capacity and, specifically, with respect to McBay's medical opinions.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Srite's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 8th day of April, 2021.


_____
UNITED STATES MAGISTRATE JUDGE